491 F.2d 660
 180 U.S.P.Q. 481
 COOL-FIN ELECTRONICS CORPORATION, Plaintiff-Appellee,
v.
INTERNATIONAL ELECTRONIC RESEARCH CORPORATION, Defendant-Appellant.
COOL-FIN ELECTRONICS CORPORATION, Plaintiff-Appellant,
v.
INTERNATIONAL ELECTRONIC RESEARCH CORPORATION, and
United-Carr, Incorporated, Defendants-Appellees.
 Nos. 72-1023, 72-1056.
 United States Court of Appeals, Ninth Circuit.
 Jan. 9, 1974, As Amended on Denial of Rehearing Feb. 25, 1974.
 
 Vernon D. Beehler (argued), Bruce A. Jagger of Beehler, Arant, Mockabee, Jagger & Bethel, Richard Hungate (argued), Louis P. Petrich of Youngman, Hungate & Leopold, Los Angeles, Cal., for plaintiff-appellee.
 Frederick E. Mueller of Fulwider, Patton, Rieber, Lee & Utecht, Stanley H. Williams (argued), Philip F. Westbrook, Jr. (argued), of O'Melveny & Myers, McCutchen, Black, Verleger & Shera, Los Angeles, Cal., for defendant-appellant.
 Before ELY and CHOY, Circuit Judges, and SOLOMON,* District Judge.
 CHOY, Circuit Judge:
 
 
 1
 This appeal concerns the validity of patent No. 2,807,659, a tube shield and insert designed for protecting glass electron tubes. Cool-Fin Electronics Corporation (Cool-Fin), a now defunct manufacturer of tube shields, originally sued the International Electronic Research Corporation (IERC) for violations of the antitrust laws. IERC counterclaimed that Cool-Fin had infringed its patent. The district court tried the patent issue separately and held the IERC patent invalid, reasoning that it was anticipated by the prior art under 35 U.S.C. 102 (1970) and that it would have been obvious to one of ordinary skill in the field under 35 U.S.C. 103 (1970). IERC appeals, and we reverse.
 
 
 2
 Tube shields are metal covers used to surround electron tubes. Following World War II, electronic equipment, especially military equipment, was notoriously unreliable due largely to breakdowns in electron tubes.[1] Overheating of the tubes was a major cause. Vibration of the tubes, caused by the operation of the high-powered equipment to which the tubes were attached, was also responsible. Existing tube shields did not solve these problems. Despite expert efforts, no one had produced a reliable shield when the IERC apparatus was devised in 1952.
 
 
 3
 The patent in suit, issued in 1957, adequately remedied these deficiencies, as its commercial success confirmed. It utilizes a sheet metal insert, placed between the tube and the shield, with numerous leaf springs (flat pieces of tense metal cut out of the main sheet and appearing, aptly, like leaves) arranged in longitudinal and circumferential rows. These springs contact the glass bulb, holding it firmly in place, thereby dampening vibration. The springs provide curved contact with the tube, resulting in effective conduction of heat from the surface of the tube outward to the shield and thence to the chassis of the machinery to which the shield is secured, thus dissipating heat. The advantage of the patented device-- and its alleged patentable feature-- is the area contract provided by these arcuate leaf springs.
 
 
 4
 We need not discuss the prior art in detail. It is sufficient to note that there were a number of previously patented tube shields almost all of which are clearly different in conception and effectiveness from the patent in suit. The closest analogue to the IERC device is the Dickinson patent, No. 2,673,721.[2] In this, a few coil springs (conventional wound wire springs) are inserted in a shield. The springs encircle the tube at its central region where the wire coils of the springs contact the tube at spaced points.
 
 Anticipation
 
 5
 The trial court apparently found that the area contact concept of the IERC leaf spring insert was not contained within the four claims of the patent in issue-- claims 3, 13, 14, and 15. Claims are to be read liberally. See, e.g., Smith v. Snow, 294 U.S. 1, 14, 55 S.Ct. 279, 79 L.Ed. 721 (1935). Drawings and specifications in the patent's file folder history, while not available to enlarge a patent claim, can explain an ambiguity. See, e.g., Illinois Tool Works, Inc. v. Brunsing, 389 F.2d 38, 40 (9th Cir. 1968). In light of these principles, we find that claims 3 and 15[3] properly state that a novel feature of the IERC device is its use of leaf spring (area) contact.[4]
 
 
 6
 Alternatively, though the trial court's findings are ambiguous, the court seems to have held that even if the area concept was incorporated in the claims, the patent was still anticipated by the Dickinson device. This was clearly erroneous. It has been oft-repeated that 'anticipation is a strictly technical defense. Unless all of the same elements are found in exactly the same situation and united in the same way to perform the identical function in a prior pleaded patent, there is no anticipation.' Stauffer v. Slenderella Systems, Inc., 254 F.2d 127, 128 (9th Cir. 1957).[5] There is a major element in the IERC device not present in the Dickinson apparatus: the use of leaf springs to provide area contact. That cannot be said to be a combination of the same elements in the same way. See The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892); Kockum Industries, Inc. v. Salem Equipment, Inc., 467 F.2d 61 (9th Cir. 1972), cert. denied, 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973). Furthermore, there was no evidence that the Dickinson device produced similar results-- facts that would indicate similarity of operation. Indeed, all the evidence showed the IERC apparatus to produce dramatically improved results.[6]
 
 Obviousness
 
 7
 As to obviousness, we think the trial court was also clearly in error. One of the inquiries necessary for such a finding is whether the alleged invention would be obvious to one of ordinary skill[7] in the art. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Yet the evidence shows that others skilled in the field, notably military researchers, had been unable to find a satisfactory solution to the problem of electron tube failures. This is a weighty indication that at the then level of skill as to tube covers, the patented discovery was not obvious. See Reeves Instrument Corp. v. Beckman Instruments, Inc., 444 F.2d 263, 272 (9th Cir.), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971); Neff Instrument Corp. v. Cohu Electronics, Inc., 298 F.2d 82, 87 (9th Cir. 1961). Neither do the Dickinson patent's teachings support a finding of obviousness. Although Dickinson teaches the use of springs, they are structurally distinct, are not designed to dampen vibration, and provide merely point contact with the glass tube.
 
 
 8
 Certain secondary considerations, see Graham v. John Deere Co., 383 U.S. at 17-18, 86 S.Ct. 684, support our conclusion. The IERC shield fulfilled a long-felt need. Moreover, it was an undoubted commercial success.
 
 
 9
 Left, as we are, 'with the definite and firm conviction that a mistake has been committed,' United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), we reverse the trial court's ruling of invalidity.[8]
 
 
 10
 As to Cool-Fin's claim to an attorney's fee in connection with IERC's '108 patent counterclaim which IERC dropped and which the district court dismissed with prejudice, we do not find clearly erroneous the district court's finding that it was not of such character as to make it an exceptional case within the meaning of 35 U.S.C. 285 (1970).
 
 
 11
 Since the issue of whether Cool-Fin infringed the IERC patent has not been decided, we remand for further proceedings.
 
 
 12
 Reversed and remanded.
 
 
 
 *
 The Honorable Gus J. Solomon, United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 In military electronic equipment-- on missiles, ships, aircraft and the like-- electron tubes functioned under conditions of extreme stress. The result was an alarming rate of failure. For example, a high percentage of electronic equipment in the Navy's Atlantic fleet was inoperative at any one time. This created obvious strategic dangers, not to mention inordinate maintenance costs. The need for a solution was thus actue
 
 
 [2]
 The Dickinson patent was not considered by the Patent Office as a prior reference when it issued the IERC patent. Because we conclude that Dickinson in more pertinent than the prior art considered by the Patent Office, we consider the IERC patent without the aid of the usual presumption accorded issued patents. See Westinghouse Electric Corp. v. Titanium Metals Corp., 454 F.2d 515, 516 n. 2 (9th Cir. 1971), cert. denied, 407 U.S. 911, 92 S.Ct. 2439, 32 L.Ed.2d 685 (1972); Aerotec Industries v. Pacific Scientific Co., 381 F.2d 795, 803 (9th Cir. 1967), cert. denied, 389 U.S. 1049, 88 S.Ct. 788, 19 L.Ed.2d 843 (1968); Jacuzzi Bros., Inc. v. Berkeley Pump Co., 191 F.2d 632, 634 (9th Cir. 1951)
 
 
 [3]
 We agree that the other two claims in issue, claims 13 and 14, cannot be read to incorporate the area contact concept of the leaf springs. Rather, they claim, in brief, that the longitudinal and lateral arrangement of a multiplicity of uniformly spaced springs serves to distinguish the device. Since the Dickinson device also has a similar configuration of springs, it was not clearly erroneous to find these claims were anticipated
 
 
 [4]
 Claim 3 calls for a 'means of holding the tube within the envelope comprising a multiplicity of substantially flat surfaced spring contact elements of heat conducting metal . . ..' Claim 15 states that the device includes 'spring elements (which are) productive of contact areas of substantial uniformity . . ..' When viewed in light of the drawings in the file folder, which show leaf spring angular contacts, both claims include the notion of area contact
 
 
 [5]
 Accord Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc., 436 F.2d 1180, 1182-1183 (7th Cir.), cert. dismissed, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971); Walker v. General Motors Corp., 362 F.2d 56, 58 (9th Cir. 1966); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 398 (10th Cir. 1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); National Lead Co. v. Western Lead Products Co., 324 F.2d 539, 544 (9th Cir. 1963)
 
 
 [6]
 The trial court totally discounted certain tests comparing the performance between the Dickinson and IERC shields. While the tests were flawed in certain respects, they did indicate there were substantial differences in effectiveness between the two devices. Indeed, the Dickinson point contact causes mechanical strains in the glass tube that tend to destroy the tube. More importantly, Cool-Fin did not show there were similarities in result
 
 
 [7]
 This theoretical person of ordinary skill is 'charged with knowledge of all that the prior art disclosed at the time of his alleged invention, irrespective of whether persons of ordinary skill in the field, or he himself, or anyone else, actually possessed such all-encompassing familiarity with prior disclosures.' Walker v. General Motors, 362 F.2d 56, 60 n. 3 (9th Cir. 1966)
 
 
 [8]
 Because we reverse on the validity issue, it is unnecessary to consider IERC's contention that the trial court's findings were overbroad. It is also unnecessary to consider Cool-Fin's appeal from a denial of attorney's fees on that issue, provided by 35 U.S.C. 285 (1970) in 'exceptional' cases, since such an award may be made only to the prevailing party