569 F.2d 1084
 197 U.S.P.Q. 449, 1978-1 Trade Cases 61,918
 SANTA FE-POMEROY, INC., Plaintiff-Appellant and Cross-Appellee,
v.
P & Z COMPANY, INC., Dinwiddie Construction Company and
Henry J. Degenkolb & Associates,
Defendants-Appellees and Cross-Appellants.
 Nos. 75-2647, 75-2741.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 21, 1978.
Rehearing Denied May 25, 1978.
 
 1
 John Thomas McCarthy (argued), William Michael Hynes (argued), of Townsend & Townsend, San Francisco, Cal., for defendants-appellees and cross-appellants.
 
 
 2
 Appeal from the United States District Court for the Northern District of California.
 
 
 3
 Before HUFSTEDLER and KENNEDY, Circuit Judges, and JAMESON,* District Judge.
 
 JAMESON, District Judge:
 
 4
 Santa Fe-Pomeroy, Inc., assignee and owner of United States Patent No. 3,412,562, the Doughty Patent, instituted this action against the defendants for patent infringement. The defendants counterclaimed, alleging invalidity of the patent, patent misuse, and violation of the antitrust laws in the licensing of the patent. The district court held that the patent was invalid for obviousness under 35 U.S.C. § 103,[1] but that there was no patent misuse or violation of the antitrust laws by Santa Fe or its predecessor in interest, Ben C. Gerwick, Inc. Santa Fe has appealed from the judgment holding the patent invalid for obviousness. The defendants have cross-appealed from the holding that there was no patent misuse and no violation of the antitrust laws. We reverse the district court's holding that the patent was invalid and affirm its holding that there was no misuse of the patent or antitrust violation.
 
 
 5
 Santa Fe and defendant P & Z Company, Inc. are competing contractors in the building of subterranean foundations in the City of San Francisco. These subterranean foundations are used in the construction of high-rise buildings and subways. Defendant Dinwiddie Construction Company is a general contractor, and defendant Henry J. Degenkolb & Associates is a group of engineers. The inventor, Samuel Clifford Doughty, was chief engineer of Ben C. Gerwick, Inc., Santa Fe's predecessor in interest, and the patent in question was issued to Gerwick on Doughty's application.
 
 Factual Background
 
 6
 A portion of the downtown area in the City of San Francisco is built upon soil which has filled in what was formerly the Yerba Buena Cove of San Francisco Bay. The fill soil comprises the remains of timber pile wharves, old, decayed ships, and eroded clay and sand washed into the bay from mining operations in the hills of the Sierras during the gold rush days. The soil conditions are highly unstable, with a high water table, making building construction extremely difficult. Excavation of foundations for new buildings can cause settling and subsidence of adjacent structures due to shifting soil and water. The problem is magnified because many of the existing structures in the area which are often considered to be architecturally noteworthy are built upon rather shallow foundations.
 
 
 7
 As the city grew, there was a need to construct larger, high-rise buildings in the downtown area, including the Yerba Buena Cove, but soil conditions often thwarted development. In 1963 the Bank of California decided to construct a new high-rise office adjacent to the historic Bank of California building.[2] To avoid expensive and risky underpinning of the old Bank, the architects required that there be no leakage or shifting of soil or water from under that structure during the excavation of the deep foundation and basement for the new building. Engineers had to find a means of constructing a strong and rigid, watertight, structural foundation wall prior to excavation.
 
 
 8
 Henry J. Degenkolb, president of defendant Degenkolb was the structural engineer responsible for designing the new Bank's foundation wall. He worked as a member of a group with Fred Pavlow, president of defendant P & Z, and William E. Moore, a partner in a soils engineering firm. They designed a secant type foundation wall,[3] consisting of a series of mutually intersecting circular, columnar, concrete piles. Vertical holes were to be drilled into the earth along the line of the foundation, at a distance slightly less than the hole diameter apart. Concrete would then be poured into those holes. Before the concrete completely hardened, new holes were to be drilled into the spaces between the old holes, cutting a groove into the previously poured columns. More concrete would be poured into the new holes to form a column which intersects with the previously poured columns on either side.
 
 
 9
 This method, the so-called "Degenkolb Scheme", however, was never employed. Ben C. Gerwick, of Ben C. Gerwick Inc., was interested in bidding on the foundation job for the new Bank, but he was convinced that the Degenkolb design would be difficult to execute because of the problem in aligning the columns so that they would be certain to intersect and overlap to form a rigid, watertight wall. Improper alignment could lead to soil and water leakage and possibly damage the old Bank. He assigned the task of designing an alternative method to Doughty, his chief engineer. After some time Doughty conceived the process which was eventually adopted and successfully employed by Gerwick in constructing the new Bank's foundation. On Doughty's application United States Letter Patent 3,412,562, entitled "Structural Wall and Method", was issued to Gerwick on November 26, 1968.[4]
 
 
 10
 At the time the engineers were attempting to devise a foundation method for the Bank, another engineering group was seeking methods for constructing foundations and subterranean walls for the new Bay Area Rapid Transit District (BARTD) system. As with the Bank group, this group was confronted with the problem of treacherous soil conditions. William Armento, a civil engineer, was placed in charge of a study team of 10 to 12 engineers to survey existing subterranean foundation methods, analyze their applicability to BARTD needs and conditions, make recommendations and, if need be, develop new methods. Armento's team worked on this project over two years and produced two reports to make available to BARTD designers and engineers information about all available foundation wall technologies. The team also developed one new construction method which had never been employed before. Although the reports were quite comprehensive, neither report referred to any foundation process similar to that invented by Doughty and used by Gerwick at the Bank of California.
 
 
 11
 Armento's group learned of the Doughty process as it was being utilized at the Bank. Although Armento was initially skeptical, after the method was successfully employed on the Bank project, the BARTD team chose to adopt it as the required method of construction for one subway station and as an alternative method for several others. BARTD obtained a license to use the Doughty process and, subsequently, a number of BARTD stations were constructed with that process.
 
 
 12
 Use of the Doughty process was not limited to the Bank and BARTD projects. It was used on a number of new deep foundations in the Yerba Buena Cove area of the city and also used in constructing foundations in difficult soil conditions in Omaha, Nebraska and Baltimore, Maryland.[5]
 
 The Doughty Patent
 
 13
 The Doughty patent comprises 10 claims. Claims 1-8 describe with slight variations the specific sequence of process steps employed to construct the foundation wall. Claims 9-10 describe the finished wall product which results from the process described in Claims 1-8. In general, the process may be described in six steps as follows:
 
 
 14
 (1) Vertical holes are drilled along the line of the intended wall and filled with driller's bentonite mud (slurry)[6] to seal the holes and support the sides of the hole to prevent collapse. The holes are spaced along the wall line at a distance which may vary depending upon soil conditions and other engineering considerations. In one preferred embodiment of the process, the holes would be spaced twice their width (or diameter) apart.
 
 
 15
 (2) Steel H beams are inserted into the holes with the flanges of the beams aligned so that they run parallel along the line of the intended wall.
 
 
 16
 (3) The soil between two of the H beams is excavated, preferably with a clamshell type bucket, to form a rectilinear trench as wide as the H beams between the parallel flanges of the beams. This trench is filled with slurry during excavation to support the trench walls and prevent collapse.
 
 
 17
 (4) After excavation to the desired depth is completed, the slurry in the trench is displaced by tremie concrete,[7] which is introduced into the trench at the bottom through a pipe from the surface. After the tremie concrete fills the trench it is allowed to harden.
 
 
 18
 (5) Steps 1-4 are repeated until a continuous foundation wall comprised of alternating rectilinear concrete slabs and H beams has been formed around the perimeter of the area to be excavated.
 
 
 19
 (6) The soil within the perimeter wall is then excavated to the desired depth.
 
 
 20
 Santa Fe claims that the Doughty foundation process has significant advantages over former methods such as that designed by Degenkolb, Moore, and Pavlow. Because the wall consists of rectilinear concrete slabs linked by steel H beams, as the soil is removed during excavation the lateral forces of the soil and water on the unexcavated side of the wall increase, pushing upon the concrete slabs and developing compressive, arch action which forces the edges of the slabs tightly into the flanges of the H beams. The lateral forces against the slab are transmitted by this arch action to the vertical steel members, increasing thereby the concrete slab's resistance to these lateral forces.[8]
 
 
 21
 Certain benefits result from this arch action upon the rectilinear slabs. The tight locking of the concrete into the flanges of the H beams leads to a watertight seal between the concrete and steel and prevents water drainage and soil movement from beneath adjacent structures. Because the steel flanges of the H beams have great shear strength, the flanges are able to resist the tremendous compressive forces of this arch action and the resultant wall is very strong and rigid. There is a synergy between the concrete and steel elements of the Doughty wall. Without the high shear strength of the steel flanges the arch action on the concrete would cause failure in tension on the outer surface or shear at the edges of the slabs. The steel holds the series of slab panels in compression. If it were not for the steel beams, the concrete would have to be much thicker to resist the same lateral soil forces. At the same time, the concrete in the flanges makes the steel H beams substantially more resistant to vertical bending moments to prevent buckling as the excavation progresses downward.[9]
 
 The District Court's Decision
 
 22
 The district court held that the differences between the process described in the Doughty patent and the prior art were minimal and would have been obvious to a person with ordinary skill in the art of foundation wall construction.[10] The court based its determination primarily upon three instances of prior art the Ewen patent, the Falciola Italian patent and the Miotti patent.[11]
 
 
 23
 The Ewen Patent No. 718,441 (1903), involved a process for constructing subterranean foundation walls. The finished wall, consisting of concrete slabs supported by steel beams, was similar to the finished wall described in claims 9 and 10 of the Doughty Patent. The court found that the only pertinent difference was that Ewen contemplated conventionally poured concrete while Doughty required tremie poured concrete. Because tremie concrete was well known at the time of the Doughty invention, the court concluded that claims 9 and 10 "even if not anticipated by Ewen, would be obvious in light of the prior art to one of ordinary skill".
 
 
 24
 With respect to the process claims, 1 to 8, the court looked primarily to the prior art processes described by Falciola and Miotti. The Falciola Italian Patent, No. 545,787 (1956), describes a construction process which in certain ways resembles the Doughty process, but uses different materials and results in a structurally different finished wall. The Falciola process begins with drilling spaced, vertical holes along the line of the intended wall. Then, instead of steel H beams, pre-cast concrete piles are inserted into the holes. Once the concrete piles are in place, the space between them is drilled out and concrete is poured into the circular holes to create a finished wall of overlapping, circular columns of concrete similar to the secant type wall proposed by Degenkolb's group for the Bank of California. The court found that since Doughty's claim 1 did not expressly require steel beams, but merely described "inserting an elongate structural member into each hole," the only differences between Doughty claim No. 1 and Falciola were that (1) Doughty calls for a "substantially rectilinear trench," to form a rectilinear slab between the elongate structural members, while Falciola describes overlapping, circular concrete columns, and (2) Doughty claims that the rectilinear slab will be such as to "transmit by arch action the load of earth pressure acting against one side of the wall after the earth is removed from the other side of the wall," while Falciola omits any reference to arch action. The court decided, however, that the substitution of a rectilinear slab for the circular columns "seems to be obvious," and the arch action which thereby resulted between the structural elements "was known and obvious within the level of ordinary skill in the art. (See, e. g., Ewen No. 718441 (1903))".
 
 
 25
 With respect to process claims 2 to 8 of the Doughty patent, the court found that they differed from Falciola only in that they called for tremie concrete and specifically required the use of steel H beams. Tremie concrete was well known at the time of the invention and the use of steel H beams instead of precast concrete columns which the court saw as the "heart of the Doughty patent" was an obvious practical development in those instances where it would be necessary to provide greater structural strength in the final wall than could be provided with a concrete wall of a limited size.
 
 
 26
 The court relied on the Miotti Patent, No. 3,139,729 (1960), and a journal article which described the type of construction process involved in that patent as additional justification for invalidation of Doughty's process claims. The Miotti patent was concerned primarily with a drilling apparatus which permitted improvements upon the secant type wall construction process. Thus, the first 8 claims dealt with the apparatus itself and only claims 9 and 10 dealt with the method permitted by the apparatus. The method itself was distinct from the Falciola and Doughty processes in that it involved the construction of an impermeable partition wall or "cut-off" wall, instead of a structural foundation wall.[12]
 
 
 27
 The Miotti process described in claims 9 and 10 involves drilling spaced, circular holes along the line of the intended wall, pouring concrete into the holes to form cylindrical pilings and then utilizing the drilling apparatus to excavate a rectilinear trench with concave ends overlapping the cylindrical pilings. The rectilinear trench would be filled with concrete so that a concrete slab wall would be formed with the ends of the slab concave shaped around and interlocking with the vertical concrete columns. The process included the use of slurry during excavation of the cylindrical holes and the intersecting trenches.
 
 
 28
 The court found the only difference between the Miotti process and the process claimed by Doughty was (1) Miotti shows a cut-off wall, not a foundation wall, and (2) Miotti calls for casting the circular concrete piles in place in the holes, while Doughty calls for insertion of elongate structural members in claim 1 and steel H beams in claims 2 to 8. The court concluded that "excavating along one side of a wall previously placed on the ground is admittedly old . . . and such excavation would be obvious to one of ordinary skill in the art" and substitution of steel H beams for cast-in-place concrete piles would be similarly obvious.
 
 
 29
 The court rejected Santa Fe's contention that the specific sequence of steps in the Doughty process produced new and surprising results that made it a step forward in meeting the problems encountered with such treacherous soil conditions as found in the Yerba Buena Cove area. The court said that most of those alleged new results "stem from the use of the steel H beams and, according to the evidence, might well be expected to occur as incidents of such combination. The combination, however, is obvious in the light of prior art, for example Ewen, supra."
 
 
 30
 The court also rejected appellant's arguments based upon the failure of Degenkolb, Pavlow, Moore and the BARTD study group to achieve the Doughty solution to the problem of foundation construction in San Francisco and the rapid industrial acceptance and usage of the process invented by Doughty. The court was "convinced that whatever differences exist between the subject matter claimed by the Doughty patent and the prior art are so minimal that whatever secondary considerations are shown by the evidence is insufficient to outweigh or balance what the court finds to be obviousness".
 
 Applicable Legal Standards
 
 31
 By statute, all patents are presumed to be valid and the burden of establishing invalidity rests upon the party asserting it. 35 U.S.C. § 282.[13] The statutory presumption means that "patentees are heavily favored as a class of litigants". Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 335, 91 S.Ct. 1434, 1446, 38 L.Ed.2d 788 (1971). The presumption of validity is rebuttable only by "clear and convincing evidence". Saf-Gard Products, Inc. v. Service Parts, Inc., 532 F.2d 1266, 1271 (9 Cir. 1976). The district court did not discuss the weight it gave to this presumption, but apparently concluded that defendants had made a sufficient showing to overcome it.
 
 
 32
 The court determined that both the process described in claims 1-8 and the product described in claims 9-10 were invalid under 35 U.S.C. § 103. Section 103 provides a negative test for patentability. A patent is not obtainable for an invention "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains". Thus while the ultimate question of patent validity is one of law, § 103 "lends itself to several basic factual inquiries. Under § 103 the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). Accord Sakraida v. Ag Pro Inc., 425 U.S. 273, 280, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976).
 
 
 33
 Santa Fe contends that the district court did not fully understand " certain technical aspects of the Doughty invention" and failed to recognize " that the invention of the Doughty patent at issue is based on a sequence of steps employed in a process", but rather adopted the simplistic approach of treating the Doughty invention "as a mere combination of elements in the final product, the completed foundation wall". It is true, as Santa Fe argues, that the "entire process (e. g. the sequence of steps) must be shown to be obvious if the process is to be unpatentable". It is not sufficient to show that some of the steps individually are obvious or old. The crucial question is whether the combination of old, known materials within a new sequence of steps yielded a construction process which unexpectedly and unobviously performed functions never fulfilled by any prior art. We must consider the functional inter-relationship of the materials used and the sequence of steps in determining whether the Doughty process in its totality was obvious.The Process Claims
 
 The State of the Art
 
 34
 There are many patents pertaining to methods for construction of subterranean walls. They describe a wide variety of construction methods, depending upon the function of the final wall product, the materials used, and the condition of the soil.[14] The defendants introduced nearly 50 references to prior art methods in support of their contention that the Doughty process was an obvious development from the prior art. At trial they focused primarily upon the Ewen, Falciola and Miotti patents upon which the district court relied in making its factual findings on the state of the art. Since none of these patents was cited either by Doughty in his application or by the Patent Examiner in approving the application, the court may have believed that the statutory presumption of validity had dissipated. See Deere & Co. v. Sperry Rand Corp., 513 F.2d 1131, 1132 (9 Cir. 1975); Hewlett-Packard Co. v. Tel-Design, Inc., 460 F.2d 625, 628 (9 Cir. 1972). The court did not, however, discuss the prior art that was described by Doughty in his application to the Patent Office or cited by the Patent Office in examining and approving the patent. Nor did it discuss the similarities or differences between the prior art that was cited and that which was not.
 
 
 35
 While it is true that the statutory presumption of validity is weakened when it can be shown that pertinent instances of prior art were not considered by the Patent Examiner before granting the patent, see e. g., Deere & Co.,513 F.2d at 1131, it is equally true that "(a)lleged art that is cumulative to cited art does not weaken or destroy the presumption of validity". Saf-Gard Products, 532 F.2d at 1271 (quoting Schnadig v. Gaines Manufacturing Co., 494 F.2d 383, 391 (6 Cir. 1974)). The Patent Examiner cited four United States Patents, Judson, No. 592,738 (1897), Veder, No. 2,791,886 (1957), Booth No. 3,184,893 (1965), and Carew, No. 3,216,163 (1965), and one foreign patent, France, No. 1,127,500.
 
 
 36
 Defendants' expert, Julian Caplan, a patent attorney admitted that the Judson patent was equally "readable" on the Doughty patent as Ewen and in some respects was better because it specifically described arch action between the vertical steel structural members and the concrete slabs and Ewen did not. Caplan also admitted that the French patent cited by the examiner was very similar to Ewen and both were "pretty good" references for analyzing the obviousness of claims 9-10.[15]
 
 
 37
 With respect to the process claims 1-8, Caplan acknowledged that one of two Veder patents, which was cited by the examiner, described a wall construction process which was quite similar to that described by Falciola and Miotti. Both the Falciola and Veder methods involved construction of a secant type wall of overlapping cylindrical concrete piles, and Miotti was expressly a development and improvement upon the Veder method. We note also that in Doughty's patent application, as part of the background of the invention, he described, in essence, the Veder method of overlapping concrete columns.
 
 
 38
 The district court did not, however, discuss the Veder secant wall method or attempt to distinguish it from Falciola and Miotti and show why those were more pertinent. This raises the question of whether the court fully considered all pertinent prior art in making its findings. The court's findings ignore the fact that, in terms of engineering and structural qualities, all of the pertinent prior art methods are very similar. Each method Veder, Falciola, Miotti, and Degenkolb yields a wall comprised entirely of concrete. In Veder, Falciola and Degenkolb the wall consists overlapping cylindrical columns wherein one of every two columns has roughly an hour glass shape with a vertical concavity on opposite sides so that the adjacent columns can intersect with and overlap into that concavity. In Miotti the difference is that concrete columns alternate with more rectilinear concrete slabs. However, the concrete slabs and columns intersect in substantially the same way: the slabs are concave on the ends so that the concavity intersects with and overlaps the cylindrical columns on each end.
 
 
 39
 All of these methods resemble Doughty in that they entail drilling of spaced apart holes along the line of the wall prior to excavation, placement or construction of a structural member in the hole, excavating between the columns and filling the excavated area with concrete. All are critically different from Doughty, however, in that in no instance would the wall produce the same kind of arch action between the structural components during excavation.[16]
 
 
 40
 The essential similarity of cited and uncited prior art indicates to us that although the state of the prior art was relatively well developed in that there were a number of variations in the apparatus used and other details most of the development had occurred within a limited range of possible materials and, structurally, no one prior to Doughty had developed a pre-excavation foundation wall method which was not based upon the secant type system of overlapping concrete columns. This, in turn, means that the differences between the process described by Doughty and the prior art were more significant than found by the district court and suggests that persons with ordinary skill in the art of foundation construction had not yet contemplated the type of process claimed by Doughty.
 
 Differences Between Patent and Prior Art
 
 41
 Defendants characterize the differences between the Doughty process and the prior art processes as merely the substitution of old and well known materials into known processes. The district court agreed with this characterization of the Doughty process claims 1-8. The court looked first to the Falciola patent and found that claim 1 of the Doughty patent differed from Falciola only in that Doughty involved a rectilinear trench and concrete slab between the vertical structural columns instead of another circular column, and referred to arch action and Falciola did not. Claims 2-8 differed primarily because Doughty called for steel H beams and Falciola described pre-cast concrete piles. Relying upon the testimony of the patent attorney Caplan[17] and picking out these substituted elements from other prior art references, the court found that the substitution would have been obvious as merely a new combination of well known elements in a previously known sequence of process steps.
 
 
 42
 The court then looked to the Miotti prior art and found that the differences were that Miotti described only a cut-off wall, not a structural foundation wall, and cast-in-place concrete columns instead of steel beams. Again, the court concluded that these were not differences that would have been unobvious to a person of ordinary skill in the art.
 
 
 43
 This characterization of the differences between Doughty and the prior art misconceives the nature of the Doughty process. Although the steps in the processes resemble each other, the structural qualities of the wall which results from the Doughty process and from Falciola, Miotti, Veder or Degenkolb are distinct. The structural characteristics of the secant wall produce no arch action. Its strength depends upon increasing the steel reinforcement in the concrete. The lateral forces of the unexcavated soil upon the overlapping concrete elements in the secant wall would cause relative movement among those elements and, if the forces were great enough, might lead to shearing of the concave, overlapping corners of the concrete. Substitution of steel for concrete in the secant type wall would not necessarily change the structural features of the wall. It would reduce the shearing effect, but no arch action would develop to strengthen the wall and interlock the various elements in compression.[18] Under poor soil conditions the secant wall would have to be extremely thick and heavily reinforced to withstand the same forces as the Doughty wall.
 
 
 44
 The district court found that these differences were merely incidents of a new combination of elements and that combination was itself obvious. In so finding the court looked to a number of examples of prior art to pick out elements from them and show that Doughty really added nothing to the art. However, "a finding which . . . picks out one element in one prior patent and another element in another prior patent as a demonstration of anticipation, is manifestly insufficient to overcome the presumption arising from the issuance of the patent . . . ." Ry-Lock Co. v. Sears Roebuck & Co., 227 F.2d 615, 618 (9 Cir. 1955). The owners of the Doughty patent were not claiming the individual elements, but rather "their new relationship together" which achieves "the answer to the need . . . ." Pursche v. Atlas Scraper & Engineering Co., 300 F.2d 467, 478 (9 Cir. 1961).
 
 
 45
 In United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), the Court considered a somewhat comparable situation. The patent at issue was a non-acid "wet" battery. The Government, as defendant in the infringement suit, produced a myriad of other patents which it asserted made the combination claimed in the patent at issue obvious since all of the individual components of the invention had been used or suggested individually before. The Supreme Court concluded, however, that the patent involved more than "merely equivalent substitutions" if it were it "would have equivalent operating characteristics". Id. at 51, 86 S.Ct. 708. Instead the combination produced new and unexpected characteristics, just as the combination of rectilinear concrete slabs supported by steel beams produced, in the Doughty process, unexpected, but critical structural qualities.
 
 
 46
 We have already noted that subterranean wall construction methods constitute a well developed field of art. The basic elements have been "combined in almost every conceivable manner". See Saf-Gard Products, 532 F.2d at 1271. Nonetheless, the precise sequence of steps, using the specifically described materials to achieve results unexpected by reputable engineers had never before been attempted. That the field was so well developed but no method had achieved the critical results of the Doughty patented process is a persuasive indication that the differences between Doughty and the prior art were more substantial than found by the court below. See id. at 1271-72.
 
 
 47
 This is the type of case where the operative principle of the invention is obscure, but once perceived its design is relatively simple. As in Saf-Gard, the "primary creative value of the (Doughty process) inheres in the principle for its operation, and the mechanical means for achieving it are readily obtained. Even a minor change may produce a patentable invention where the result could not have been readily predicted beforehand by one skilled in the art". Id. at 1272. The seemingly minor changes from secant wall methods to the Doughty method produced a "beneficial coaction" of known elements in a new combination which achieved results not contemplated or taught by the prior art. See Hensley Equipment Co. v. Esco Corp., 375 F.2d 432, 436 (9 Cir. 1967).
 
 
 48
 Section 103 expressly mandates that "inquiry into patentability must be drawn toward the 'subject matter as a whole' and not to the elements of a claimed combination and their individual novelty". Reeves Instrument Corp. v. Beckman Instrument, Inc., 444 F.2d 263, 270 (9 Cir.) cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268 (1971). The subject matter of the Doughty process claims is a precise sequence of process steps using specific materials to produce compressive, arch action between the structural elements of a foundation wall such that the wall is rigid, watertight, and sufficiently strong to resist the variable bending moments caused by the lateral soil pressures during excavation. The sequence of steps and the material used are interdependent and the subject matter as a whole necessarily comprises the process steps, the materials used, and the structural results thereby produced. Taken as a whole, the Doughty process is distinguishable from the prior art relied upon by the district court. Despite the superficial similarities between the Doughty process and those patents, none of those patents either "purposely or fortuitously" achieved the "critical result" of developing arch action and a compression interlock between the structural components of the wall during excavation. See Saf-Gard Products, 532 F.2d at 1271.
 
 
 49
 The district court rejected Santa Fe's contentions with respect to the unobvious development of arch action in the Doughty process and the lack of arch action in the secant type walls by referring to the wall illustrated in the Ewen patent. The court found that the final wall product in Ewen and Doughty was virtually identical, although it acknowledged that "(t)his identity appears after all wall construction processes have ceased". The court concluded, nevertheless, that "Ewen inherently shows each slab to be sufficiently thick with respect to the span of the slab between the I-beams to transmit by the phenomenon known as 'arch action' the load on the slabs to the associated pair of beam members."
 
 
 50
 It is true that drawings which accompany the Ewen patent illustrate a concrete slab and I beam wall. The patent, however, did not claim the final wall product. Rather it expressly pointed out that "any kind of a retaining wall can be built according to my process" and the wall "may be made of any desired materials . . .". Thus, like Doughty, Ewen was concerned primarily with a construction process; unlike Doughty, the particular materials used in the final wall were not a crucial part of the process. All Ewen's claims deal with a method of constructing subterranean foundation walls in a wide, excavated trench.[19] His invention is the method of employing a system of long jacks running between the sides of the trench to keep the trench from caving in during excavation. After the trench is completed a system of shorter jacks replaces the long jacks to allow the construction of a free-standing wall within the trench. Many alternative building materials could have been used without affecting the process and no arch action inhered in the wall during construction or during subsequent excavation because the wall was free-standing. The only arch action which inhered in the Ewen wall occurred upon back filling the unexcavated side of the trench after the wall was finished.[20] The sequence of steps in Ewen's process patent did not lead to the same type of compression interlock at the concrete slab H beam joints through arch action during excavation as was contemplated by Doughty. Arch action may have been an incident of the final wall produced by Ewen's process, but it was not a crucial, integral aspect of the process itself. It does not appear to us that Ewen would have taught a person of ordinary skill in the art that constructing a foundation wall of alternating elements of rectilinear concrete slabs and steel beams would produce the "critical result" of arch action during the excavation of one side of the wall.
 
 The Level of Ordinary Skill in the Art
 
 51
 Having determined that the differences between Doughty and the prior art were greater than found by the district court, we must next consider the level of skill in the art. Whether the differences between Doughty and the prior art rise "to the level of patentability depends upon the level of ordinary skill in the pertinent art". Reeves Instrument Corp., 444 F.2d at 271. The court's findings adopted the position urged by the defendants. As with the findings on the differences between Doughty and the prior art, the findings with respect to the level of ordinary skill in the art pick out isolated elements from various prior art references to show that each element of the Doughty process had been used or suggested previously. The court found that a person with ordinary skill in the art could have readily chosen those elements and substituted them into the already known processes for constructing secant type foundation walls. The court saw the use of steel beams instead of concrete columns as "the heart" of the Doughty process and found that an engineer with ordinary skill would naturally choose steel over concrete in those instances where the lateral soil forces the wall would have to resist were so great that concrete would be ineffective. The court characterized this substitution as a simple engineering choice between essentially interchangeable structural members. The findings similarly downplayed the significance of the rectilinear shape of the concrete slab and the consequent arch action by referring to Ewen and others to show that these aspects of Doughty were known to persons of ordinary skill.
 
 
 52
 The findings overlook substantial testimony with respect to the level of ordinary skill in the art. There was considerable uncontradicted evidence, for example, that although it was well known that steel had greater shear and tensile strength than concrete, steel and tremie concrete had never before been used together to construct a subterranean finished wall prior to excavation which would be exposed to underground moisture. Various witnesses testified that two reasons had precluded such an application of those materials: (1) within the engineering profession it was a rather well accepted tenet that bare steel should not be exposed to moist soils because corrosion would result and weaken the steel, and (2) tremie concrete poured into a slurry filled hole would not bond with the steel H beams.[21] Gerwick testified that when Doughty first proposed his method, the other engineers on Gerwick's staff refused to calculate the structural dimensions for the steel beams, but would only analyze the method using concrete beams. Armento testified that persons working in the field would not think of substituting steel for concrete piles where the lateral soil forces were very great, but instead would attempt to strengthen the concrete by adding steel reinforcement rods to the concrete. One representative of the defendants testified that initially they did not believe that Doughty's process would be successful, and Armento said that he "wondered" about it and was quite "skeptical".[22] Nonetheless, once the method showed itself to be successful, the defendants all adopted and used it and continue to use and recommend it.
 
 
 53
 Factual findings on the level of ordinary skill in the pertinent art " can be made only by an analysis of the problem allegedly solved by the invention and the efforts of others to arrive at a satisfactory solution". Reeves Instrument Corp., 444 F.2d at 271; accord Austin v. Marco Dental Products, Inc., 560 F.2d 966, 971 (9 Cir. 1977). See also Graham, 383 U.S. at 17-18, 86 S.Ct. 684. Since it is clear that there have been many attempts to develop methods for safe construction of subterranean walls but no method before had achieved the results achieved by Doughty, we are persuaded that the level of ordinary skill in the art did not reach the Doughty invention. All of the elements of the Doughty method were admittedly well known, but no one before Doughty had seen fit to combine them in the manner he did. Defendants themselves had tried to devise a solution for the Bank project and could only come up with a system that closely approximated the secant wall of Veder.[23] Similarly, Armento's BARTD group worked for two years and did not arrive at the solution to the foundation wall problem devised by Doughty, though it did analyze numerous methods, including one that closely followed Veder.[24]
 
 
 54
 The trial court viewed the failure of anyone to suggest the use of steel and concrete in combination as a result of "conservative hesitancy about the practicality of that procedure. . . ." In our opinion that conservative hesitancy supports rather than undercuts the claimed unobviousness of Doughty's process. It shows that a person of ordinary skill in the art would not obviously consider the combination. The known disadvantages of such a combination would discourage a person with ordinary skill in the art from searching into solutions involving it. To combine these elements as he did, Doughty had to ignore "long accepted factors" and "known disadvantages" and the "expressed disbelief" of experts in the field. See United States v. Adams, 383 U.S. at 52, 86 S.Ct. 708 at 714. As the Supreme Court noted in Adams, "known disadvantages . . . which would naturally discourage the search for new inventions may be taken into account in determining obviousness". Id.
 
 The Obviousness of the Process
 
 55
 In an opinion reversing a holding of the district court that a patent was invalid for obviousness, Judge Learned Hand, in Reiner v. I. Leon Co., 285 F.2d 501, 503-04 (2 Cir. 1960), noted that § 103 "directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time". Judge Hand suggested some "sign posts: how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?" Id.
 
 
 56
 In Graham, supra, the Supreme Court made it clear that courts may properly infer non-obviousness from evidence of long felt but unsolved needs, failures of others, and subsequent success and acceptance. 383 U.S. at 17-18, 86 S.Ct. 708. Citing Judge Hand's opinion in Reiner, the Court stated that these "subtests" are "more susceptible of judicial treatment than are the highly technical facts often present in patent litigation". Id. at 36,86 S.Ct. at 703. These factors aid the judiciary and prevent it from " slipping into use of hindsight". Id.
 
 
 57
 This court has held that a patent will not be invalidated simply because "it embodies a solution which seems simple and obvious with the benefit of hindsight". Saf-Gard Products, 532 F.2d at 1272. "When the evidence shows that several others in the art have attempted to solve the same problem and have not arrived at the solution claimed by the patent in suit, the statutory presumption of validity is substantially strengthened." Reeves Instrument Corp., 444 F.2d at 272 (footnote omitted). Acceptance by the industry and commercial success are factors to be given weight.
 
 
 58
 Santa Fe has met all of these "subtests". Approximately 15 highly qualified engineers had worked for an extended period on the identical problem faced by Doughty. None found the solution. Despite professional skepticism, Doughty alone discovered the combination of specific steps and specific materials which provided a method for constructing subterranean walls under difficult soil conditions. Once the Doughty process was made known, the defendants, the BARTD group, and others adopted and used it. The evidence as a whole requires a reversal of the district court's findings and holding of invalidity.[25] See Cool Fin Electronics Corp. v. International Electronic Research Corp., 491 F.2d 660, 662-63 (9 Cir. 1974).
 
 The Product Claims
 
 59
 The district court also invalidated claims 9 and 10 which described the final wall produced by the process. The court found that the structure described therein was "identical" to the wall described in Ewen. We have of course concluded that Ewen, like Doughty, was concerned primarily with a construction process and did not claim the final wall product. As we have noted, under Ewen the wall is constructed after excavation, and under Doughty before excavation.[26] While the process claims were not obvious by reason of Ewen, we can not say that the district court's findings with respect to the final product itself are clearly erroneous. Accordingly, we affirm the district court's decision holding claims 9 an 10 invalid.
 
 
 60
 Patent Misuse and Violation of Antitrust Laws
 
 
 61
 By license agreement dated June 1, 1966, Ben C. Gerwick, Inc. licensed use of the Doughty process to BARTD.[27] Paragraph 6 of the agreement provided that if BARTD or any of its contractors or subcontractors made or acquired any improvements in the licensed invention, those improvements would immediately be disclosed to Gerwick and Gerwick would have the first right to attempt to patent them. The agreement also provided, however, that BARTD could use any of those improvements without payment of additional royalties.[28] In their answer, the defendants asserted as an affirmative defense that this grant-back provision constituted patent misuse, making the patent unenforceable. They also counterclaimed, alleging that the grant-back violated "the antitrust laws of the United States. . . ." On appeal they argue that the grant-back violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[29]
 
 
 62
 The district court found that in general "(v)arious methods and types of deep foundation walls compete with and are used as alternatives to (Doughty) walls . . ." and, in particular, these alternatives were available for use on BARTD projects. "Except in one instance in which BARTD designated the (Doughty) wall due to soil conditions, bidders were free to elect the (Doughty) method or alternatives provided in the BARTD specifications." The court found that alternative methods were bid in competition with Doughty in ten instances and the Doughty method was utilized in only four BARTD stations. As such, the court found that the license did not constitute "attempted monopolization of the deep foundation wall market". The court concluded that because the grant-back was limited in operation to the time and subject matter of the license it was legally permissible. The court also rejected the defendants' contention that the grant-back was an illegal tying provision because "the licensee was not required to accept a second product in addition to the license. . . ."
 
 
 63
 The defendants contend that the district court erred in not finding that the grant-back was illegal per se as a tie-in. They argue that the grant-back impermissively extended the patent monopoly "beyond the confines of the main licensed patent to tie up sublicensees and their right to invent during the course of work on a publicly-financed construction project". Santa Fe contends that the counterclaim was properly dismissed for failure to allege the jurisdictional requirement of an effect upon interstate commerce, and if there is jurisdiction, the grant-back was not illegal as a tie-in under § 1 or an attempted monopolization under § 2 of the Sherman Act.
 
 Jurisdiction
 
 64
 The district court found that the "subject matter of the license agreement, Doughty United States Patent 3,412,562 was within the flow of interstate commerce in that it was used to construct accused deep foundation walls in San Francisco, California; Washington, D. C.; and Omaha, Nebraska". Santa Fe contends that it is not sufficient under sections 1 and 2 of the Sherman Act that the grant-back clause affect a business in interstate commerce, but rather it must affect "the interstate commerce of such a business". Page v. Work, 290 F.2d 323, 330 (9 Cir. 1961). It argues that the grant-back was entirely local in operation and effect, involving only 17 construction projects in the Bay area.
 
 
 65
 Congress in enacting the Sherman Act "wanted to go to the utmost extent of its Constitutional power" under the Commerce Clause. United States v. South-Eastern Underwriters Association, 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944). Accord Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 194, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); Gough v. Rossmoor Corp.,487 F.2d 373, 375 (9 Cir. 1973). Our inquiry with respect to jurisdiction in a Sherman Act case is distinct from our inquiry on the merits. Gough, 487 F.2d at 375. With respect to jurisdiction, the focus simply is "whether the (Gerwick's) conduct had a sufficient relationship to interstate commerce to be subject to regulation by Congress".[30] Id. at 376. This in turn depends upon whether the conduct has a "substantial economic effect" upon interstate commerce. Id. That effect may be produced by purely local activities. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Manufacturers Association, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).
 
 
 66
 It is true that the grant-back pertained only to licensing of intrastate construction projects. The effect, however, extended beyond the boundaries of California. Because of the required grant-back, any improvements on the Doughty process devised by BARTD contractors such as P & Z could not be utilized by those contractors on other projects outside the state, even though the improvements originated with the contractors.[31] P & Z and other BARTD contractors would have to obtain licenses for both the Doughty process and any improvements upon it. Accordingly, we agree with the district court that the grant-back did affect the free flow in interstate commerce of improvements upon the Doughty process, and that the district court had jurisdiction of the counterclaim.
 
 The Merits
 
 67
 Defendants characterize the grant-back clause as a tie-in arrangement whereby as a condition to licensing the Doughty process Gerwick required BARTD and BARTD contractors to grant back the rights to patent all improvements thereon. They argue that the uniqueness and desirability of the Doughty process and the BARTD construction projects effectively coerced contractors into accepting the onerous grant-back terms of the license. Through the grant-back the licensor extended the reach of the patent monopoly "to derive a benefit not attributable to use of the patent's teachings". Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 136, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129 (1961).
 
 
 68
 The Supreme Court considered and rejected a similar argument in Transparent-Wrap Machine Corp. v. Stokes & Smith Co., (TransWrap), 329 U.S. 637, 648, 67 S.Ct. 610, 616, 91 S.Ct. 563 (1947), where the Court concluded that "the inclusion in the license of the condition requiring the licensee to assign improvement patents is not per se illegal and unenforceable". Relying upon prior tie-in cases the court of appeals had held the grant-back clause illegal, saying, "We do not see what difference it makes . . . whether the (licensee) is compelled to buy all improvements from the (licensor) by means of a transfer of the (licensee's) patents, or by means of a contract . . .". Stokes & Smith Co. v. Transparent-Wrap Machine Corp., 156 F.2d 198, 202 (2 Cir. 1946). In reversing, the Supreme Court made it clear that a grant-back clause in a patent license is distinct from a coerced tying of unpatented products to a patent license. The Court said in part:
 
 
 69
 An improvement patent, like the basic patent to which it relates, is a legalized monopoly for a limited period. The law permits both to be bought and sold. One who uses one patent to acquire another is not extending his patent monopoly to articles governed by the general law and as respects which neither monopolies nor restraints of trade are sanctioned. He is indeed using one legalized monopoly to acquire another legalized monopoly.
 
 
 70
 329 U.S. at 644, 67 S.Ct. at 614.
 
 
 71
 The Court reasoned that Congress had not made illegal the acquisition of improvement patents by the owner of a basic patent. Nor had Congress placed any limitation upon the types of consideration for which patents could be assigned. Thus the improvement patents must be viewed as simply a species of property given as consideration for the right to use the basic patent. The Court recognized that by acquiring the improvement patents the licensor acquires another monopoly which extends beyond the term of his basic patent, but "that is not creating by agreement a monopoly which the law otherwise would not sanction. The grant of the improvement patent itself creates the monopoly". Id. at 646, 67 S.Ct. at 615.[32]
 
 
 72
 In TransWrap, however, the Court did suggest that on a different set of facts there were "possibilities of abuse in the practice", 329 U.S. at 646, 67 S.Ct. at 616, and "the use of a condition or covenant in a patent license that the licensee will assign improvement patents may give rise to violations of the anti-trust laws". Id. at 648, 67 S.Ct. at 616. (footnote omitted). Defendants argue that such a different set of fact is present here. They point out that in TransWrap the license was exclusive and resulted in no competition between the licensor and licensee, and further that the BARTD contractors had not freely bargained for the grant-back, but had to accept it as a condition to taking BARTD projects.
 
 
 73
 While these factual differences weaken somewhat the application of the holding in TransWrap, we decline to set aside the findings and decision of the district court on this issue. We do not find that the grant-back had the broad anticompetitive effects alleged by defendants. See Zajicek v. KoolVent Metal Awning Corp., 283 F.2d 127, 132 (9 Cir. 1960). The district court found that there were many competitive, alternative methods of subterranean foundation construction, some of which were available as alternatives on all but one BARTD project.[33] Bidders on BARTD projects were free to elect either the Doughty process or an alternative method, and in most instances these alternative methods were chosen because of economic considerations and because soil conditions were not so bad as to require the Doughty process. It thus cannot be said that BARTD contractors were coerced into agreeing to the grant-back provision.
 
 
 74
 Moreover, as the court found, the grant-back was limited in time and subject matter to the duration of the BARTD contract, and therefore had no restrictive or "chilling" effect on any improvements devised during the performance of non-BARTD projects.[34] The president of P & Z admitted that the grant-back had not hindered improvement of the process on the other projects where P & Z had used it. Any alleged attempt to monopolize foundation wall technology by chilling the incentive to invent and funnelling all improvements to the licensor is not supported by the record.[35] Although the Doughty process has been widely accepted, it by no means has a monopoly on foundation wall construction. Further, Gerwick could have conditioned the license to BARTD upon requiring BARTD to use the Doughty process on all projects, but instead Gerwick permitted other contractors to bid on BARTD projects using the Doughty process to compete with it.[36] Apparently, defendant P & Z was, in fact, more successful than Gerwick in bidding on BARTD projects and ultimately realized more financial gain than Gerwick from using the Doughty process. Finally, any improvements developed on BARTD projects would have gone to Gerwick, but they would still be available for use by BARTD contractors without payment of additional royalties.[37]
 
 Conclusion
 
 75
 We reverse the judgment of the district court insofar as it holds process claims 1-8 invalid and affirm its holding that product claims 9-10 were invalid. We affirm the court's dismissal of defendants' counterclaim based on alleged patent misuse and violation of antitrust law. Since the district court found that all claims of the Doughty patent were invalid, it did not reach the question of infringement. On remand it will be necessary to make additional findings with respect to this issue.[38]
 
 
 76
 Affirmed in part and reversed in part, and remanded for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 Section 103 of Title 35 reads:
 Conditions for patentability Non-obvious subject matter. A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
 
 
 [2]
 The old Bank building was built in 1907 upon relatively shallow timber pilings. The Bank wanted to preserve the old building, but needed to build the new building close to it
 
 
 [3]
 The term "secant" wall derives from the intersecting circular sections of concrete columns which result in this method of wall construction
 
 
 [4]
 The original patent application, Serial No. 418,778, was filed on December 16, 1964. This application was abandoned in favor of Continuation-in-Part Application Serial No. 682,763, filed November 14, 1967
 
 
 [5]
 The complaint charged defendants with patent infringement by using the patented process at the St. Francis Hotel Towers in San Francisco. Defendant P & Z had used it in Omaha and Baltimore as well. Degenkolb had recommended its use on several other California projects
 
 
 [6]
 Bentonite slurries are thixotropic mixtures which form a gel-like substance in the quiescent state, but which become fluid or liquid when shaken, stirred or otherwise disturbed. When the disturbance ceases they return to the more solid, gel-like state
 
 
 [7]
 "Tremie" concrete generally refers to the apparatus for depositing and consolidating concrete under water or very damp conditions
 
 
 [8]
 Testimony of Dr. John A. Blume described how this arch action alters the stresses upon the concrete slab. Assuming one unit of pressure from the unexcavated soil, the presence of arch action transmits these lateral pressures toward the edges of the slab so that at the H beam flange junction of concrete and steel the forces are equal to 4.5 units of pressure. Yet, at the same time, the forces on the outside of the slab, opposite to the unexcavated soil, have been reduced to as little as 0.02 units of pressure
 
 
 [9]
 During excavation it is necessary to cross brace the wall. As excavation progresses portions of the wall, below the bracing will tend first to bend away from the excavation, but then, as excavation proceeds below the bracing, will bend toward the excavation
 
 
 [10]
 A Memorandum of Decision on the issue of patent validity was filed on June 28, 1973. At a hearing on May 30, 1975 the court adopted detailed findings of fact and conclusions of law prepared by the defendants, and these were filed on June 4, 1975
 
 
 [11]
 The defendants presented the court with nearly 50 separate prior art references in their attempt to demonstrate the obviousness of the patented process
 
 
 [12]
 A cut-off wall is a subterranean wall built to prevent the movement of water under the ground. No excavation follows construction so the principal concern is not structural strength or rigidity but watertightness
 
 
 [13]
 Section 282 of Title 35 reads in pertinent part:
 A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it.
 
 
 [14]
 For example, some methods require excavation prior to construction of the wall, others entail excavation after construction, and some never require excavation
 
 
 [15]
 We note also that Ewen may well have been considered but not cited by the examiner since the Booth patent, which he did cite, referred to Ewen
 
 
 [16]
 In the Doughty process the lateral forces are transmitted by arch action toward the flanges of the H beams which, because of the shear strength of steel, are able to hold the slabs together in a compression interlock. In contrast, in all the secant wall processes, including Miotti, the lateral forces would be resisted only by the small concrete edges of the concavity which intersects and overlaps with the adjacent columns. Because of the relative weakness of concrete in shear, too much lateral pressure during excavation would cause breakage of those small overlapping edges of concrete
 
 
 [17]
 Caplan, a member of the patent bar, was admittedly unskilled in the art and based his testimony upon the disclosures in the patent documents, not upon any training or experience in engineering. He acknowledged during his testimony that he knew little about the arch action described in the Doughty claims. This testimony is of questionable value in overcoming the presumptive validity of the patent. See generally Woodstream Corp. v. Herter's Inc., 446 F.2d 1143, 1157 (8 Cir. 1971)
 
 
 [18]
 Substitution of steel beams for the initial concrete piles would not produce arch action as long as the concrete poured between those beams was still essentially in the form of cylindrical columns. Of course, Miotti did describe a more rectilinear concrete slab to intersect the first poured cylindrical, structural columns so, arguably, substitution of steel could lead to arch action there. We do not believe, however, that the teachings of Miotti would lead one to substitute steel for concrete in that process because Miotti's principal concern was an apparatus for digging the rectilinear trench with concave ends to overlap with the concrete columns. That apparatus, or digging tool, would be totally ineffective and non-functional if steel beams were used in place of the concrete. Thus it appears unlikely that a person skilled in the art of Miotti would make such a substitution
 
 
 [19]
 Ewen, unlike Doughty and unlike the secant type walls of Veder, Falciola, Miotti and Degenkolb, required that excavation occur prior to construction of the wall. His patent described how the excavation could take place and how the wall could then be constructed, free-standing, within the excavated trench
 
 
 [20]
 As noted supra, under Ewen the excavation occurs prior to construction of the wall. The Doughty wall is completed before the excavation begins
 
 
 [21]
 This belief among the engineering profession would tend to reduce the value of the teachings of Ewen regarding a concrete slab and steel beam foundation wall. The Ewen patent showed such a wall, but it was constructed with traditional, not tremie, concrete and dry steel in a previously excavated trench. A person with ordinary skill in the art would have to ignore the expected bonding problems to arrive at the Doughty wall process from the teachings of Ewen
 
 
 [22]
 Armento testified that "one has to wonder if the concrete that's poured later will bond very tightly against this H-member so that we don't get water coming in through what might be a weak plane between the concrete and the steel . . . ." He said that "it wasn't until the Bank of California was fully excavated that we were able to see whether this process really worked or was a was a dream"
 
 
 [23]
 Degenkolb, Moore and Pavlow's response to the need to strengthen the secant type wall they proposed was to increase the amount of reinforcing in the concrete columns. This response belies their testimony that substitution of steel beams was an obvious and simple matter of an engineering choice among all available building materials. If that were so they would have chosen the steel from the beginning, but they did not. Their response is exactly the same as Armento testified would be the response of one with ordinary skill in the art in 1963-1964: to make the concrete more massive and add reinforcement in all of the columns, not just in alternating ones
 
 
 [24]
 A method called the Benoto caisson and secant wall process was included in the BARTD report. The report carefully described and analyzed the values of the secant wall of overlapping concrete columns
 
 
 [25]
 In reversing we recognize that there are minor variations within the claims, three of which, for instance, do not refer to arch action and one, claim 1, which does not require steel H beams. It is clear, however, from the summary and specifications that arch action was crucial to all the claims and the use of steel H beams was the preferred embodiment of the process. Moreover, we conclude that claims 5-8 contain all of the elements necessary to make Doughty's process non-obvious and, therefore, establish appellant's proprietary right to it. Any alleged deficiencies in the other claims at issue would be moot
 
 
 [26]
 Claim 9 describes a "wall construction for providing lateral support to unexcavated earth bearing against one side thereof where earth has been excavated away from the other side"
 
 
 [27]
 The license provided for a nominal royalty of $1,000 per BARTD station, to be waived if Gerwick was low bidder
 
 
 [28]
 P & Z claims that Santa Fe, pursuant to the license agreement, obtained two patents on improvements to the Doughty process P. J. York United States Patent No. 3,530,676 issued on September 29, 1970 and P. J. York 3,555,830 issued on January 19, 1971. The grant-back provision was cancelled by letter to BARTD dated March 19, 1970
 
 
 [29]
 Section 1 of the Sherman Act reads in pertinent part:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . . 15 U.S.C. § 1.
 Section 2 of the Sherman Act reads in pertinent part:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . . 15 U.S.C. § 2.
 
 
 [30]
 With respect to the substantive issues, the inquiry is "whether (GERWICK) participated in anticompetitive conduct of the kind encompassed within the statutory terms 'restraint of trade', 'monopolize', or 'attempt to monopolize'." Gough, 487 F.2d at 376
 
 
 [31]
 Defendant P & Z is engaged in foundation construction throughout the United States and apparently has used something akin to the Doughty process on projects in Nebraska and Maryland
 
 
 [32]
 In the light of TransWrap, we find the tie-in cases cited by the defendants inapposite. A tie-in "may be defined as an agreement by a party to sell one product but only on the condition that the buyer purchases a different (or tied) product . . . ." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). We agree with the district court that "the BARTD license agreement with its grant-back provision was not and could not have been a tying agreement . . . ."
 
 
 [33]
 One project, the Embarcadero Station, specified the Doughty method because of the extreme instability of the soil there
 
 
 [34]
 Although grant-back clauses arguably can have the effect of stifling the incentive to invent, "(i)t is, in fact, not impossible for a licensee to make an improvement in the licensed invention that would commercially displace the latter in whole or in part and thereby impair the value of the original invention. . . . (I)n relation to the licensee the licensor is entitled to some protection for its original investment in research and . . . a grant back is a reasonable device through which to seek such protection." 2 Nordhaus & Jurow, Patent-Antitrust Law, 58-3
 
 
 [35]
 With the exception of an improved, faster method for digging the rectilinear trench, devised by P & Z, defendants presented no evidence of improvements which might have been made had the grant-back not existed, and that one exception seems to be of doubtful patentability. No improvements ever were granted back or "funneled" to the licensor because of the license provision
 
 
 [36]
 This would seem to belie any suggestion of anti-competitive motivation on the part of the licensor, Gerwick
 
 
 [37]
 In TransWrap the Court stated:
 By reason of the agreement any improvement patent can be put to immediate use and exploited for the account of the licensee. And that benefit continues so long as the agreement is renewed. The agreement thus serves a function of supplying a market for the improvement patents. Whether that opportunity to exploit the improvement patents would be increased but for the agreement depends on vicissitudes of business too conjectural on this record to appraise.
 
 
 [38]
 While the record appears to support a finding of infringement, we decline to consider that issue for the first time on appeal. See Cool-Fin. Elec. Corp. v. Int'l Elec. Research Corp., 491 F.2d 660, 663 (9 Cir. 1974)